A. Randall, for Exceptants.

| | |
|---|---|
| THE OHIO LIFE INS. AND TRUST CO. | |
| vs. | December Term, 1849. |
| WINN AND ROSS AND OTHERS. | |

[ANTEDATING OF NOTES—SUBSTITUTION—LIMITATIONS—CHANCERY PRACTICE—
COUNSEL FEES—APPEAL.]

The antedating of notes is not, *per se*, fraudulent or evidence of a dishonest intent, but where parties with a security before them covering a particular description of notes, make notes which upon their face are not within its terms, they cannot show by parol that such notes were antedated in order to bring them within the security.

Where a mortgage was executed to secure the payment of certain promissory notes, to be made by the mortgagors and endorsed by the mortgagees, and such notes were taken in exchange for those drawn by other persons. Held—

That the holders of the notes so given in exchange are entitled to be substituted to all the rights of the makers thereof, to participate in the proceeds of the sale of the mortgaged premises.

Where cross paper is given for mutual accommodation, each party is liable to

21*

pay his own, and the holder of cross paper may prove, under a commission, by taking up his own note or exonerating the estate of the bankrupt.

Counsel fees are allowed to trustees, but a party who occupies simply the character of stakeholder will not be allowed such fees out of the funds in his hands.

It is an established rule of the Chancery Court that the statute of limitations runs against a claim or debt down to the time it is exhibited.

Where a promissory note is secured by a mortgage, the mortgagee having the legal title, is not ousted by his note's being barred by limitations, because the debt only is barred and the party holding the title may retain his legal advantage.

Parties who are entitled to be substituted in the place of such mortgagees, are entitled to the same exception from the operation of the statute with respect to proceeds of the mortgaged property.

The principle of substitution places the substitute in *all respects* in the place of the party for whom he is substituted.

Where a fund is in court for distribution among creditors, the practice of the court is to allow creditors to come in at any time before a distribution has been actually made.

So long as the fund is under the control of the court, it will let a creditor in who has been guilty of no negligence, and if necessary send the case to the Auditor to have a new account stated at his expense, notwithstanding notice to creditors has been duly given.

But where a creditor has been notified and a reasonable time allowed him to support his claim by proof, and he fails to do so, an account rejecting his claim, if ratified, will not be opened at his instance to allow him to produce further proof, though the fund is still in the hands of the trustee.

Where an order has been passed directing the Auditor to state *a final account*, still, if the fund has not been parted with by the court, creditors who had not come in at the period of the passage of such order will be allowed to do so, but new proof will not, after such order, be allowed in support of claims already filed.

After an appeal is taken and an appeal bond executed and approved, no step in the cause can be taken which by any *possible contingency* can prejudice the appellant.

An order distributing a fund among a certain class of creditors and excluding others, was appealed from by one of the parties whose claim had been admitted to a dividend, but those excluded did not appeal. HELD—

That after such appeal taken and bond given, the court cannot order the dividend allowed to one of the creditors not appealing to be paid to him.

The court has the power to direct a fund in court to be invested pending an appeal, notwithstanding some of the parties interested in the fund may refuse their assent to such investment.

---

[The first opinion of the Chancellor in this case is reported in 2 *Md. Ch. Decisions*, 25. Since that time other proceedings have taken place in the cause, and several important questions

raised and decided by the Chancellor in the opinions reported below, the first of which was delivered on the 10th of January, 1850, upon exceptions to the report of the Auditor.]

THE CHANCELLOR:

This case now comes before the court upon exceptions to the report of the Auditor, and has been fully argued by the counsel of the parties.

Some of the questions discussed at the bar, will, I apprehend, be found to be covered by the opinion and order of this court of the 5th of December, 1848. In that opinion it was said, "that the notes of Hancock & Mann held by Winn & Ross, trustees of Samuel Jones, Jr., which bear date prior to the mortgage of the 11th of April, 1846, are not entitled to the benefit of that security and must be excluded from participating in the fund raised, or to be raised, by a sale of the property embraced in it." 2 *Md. Ch. Decisions,* 37.

The order of the court changes the phraseology a little, and declares that such notes *made* prior to that date are to be excluded. But this order is to be construed with reference to the language used in the opinion, and must be understood to exclude notes which bear date prior to the date of the mortgage.

I am not prepared to say that there is no proof of the identity of the notes alleged to have been *antedated,* but if parties with a security before them applicable to a particular description of responsibilities, choose, of their own accord, to create written obligations which, upon their face, are not within the security, I think it would be a bad precedent to permit them by parol to bring them within it. I am, therefore, of opinion, that the notes in question, alleged to be antedated, are not entitled to a dividend of the fund to be distributed.

This opinion is not founded upon the idea that antedating notes is, *per se,* fraudulent, or evidence of a dishonest intent. The cases referred to by the counsel for Winn & Ross establish the contrary; but without looking to or criticising the intent, I think the parties have given the paper a character which excludes it from the security. The notes of Jones, given in ex-

change for these three notes of Hancock & Mann, were put in the market and negotiated as notes made on the day they bore date. They became legally operative instruments from that period, and the corresponding notes of Hancock & Mann must be regarded as coming into legal existence at the same time.

Since the former order of this court, a petition has been filed in the cause by Johns Hopkins and others, who allege that they hold sundry notes of Samuel Jones, endorsed by Dawson & Norwood, and which were given by the said Jones in exchange for the notes of Hancock & Mann, secured by the mortgages, and they claim by substitution, such dividends of the funds to be distributed, as would be payable to the trustees of Jones in case the said notes had been retired by him or his trustees. And the question most seriously discussed upon the present argument relates to their right of subrogation.

Before expressing, very briefly, my opinion upon this question, I will observe, that I think there is evidence upon which it may be fairly inferred that much of the paper of Jones now introduced in this cause, was given in exchange for the paper of Hancock & Mann, in the possession of his trustees. I think the testimony of Jacobson, the clerk of Jones, his memory being aided and refreshed by the entries in the leger kept by him, and in which the original entries of these transactions were made, does establish the fact of such exchange with reference to a number of these notes, and I am of opinion, that the Auditor may, upon his proof, taken in connection with the leger, ascertain with a reasonable degree of certainty which of the notes there entered were given in exchange for the notes of Hancock & Mann.

In the former opinion of the court it was said, that the trustees of Jones could not be permitted to receive dividends upon all the notes of Hancock & Mann, whether the counter notes given by Jones had or had not been paid, and before it was ascertained what dividends his estate would pay the holders of them.

The dividends to be paid to the trustees were to be measured by the dividends which they should pay to the holders of the

paper of Jones given in exchange for that of Hancock & Mann. It follows, therefore, that if these trustees could have shown that they had paid all such notes, they would have been entitled to a dividend upon the whole amount of the paper of Hancock & Mann in their possession. But the holders of this paper of Jones now come in and say, here it is, pay us directly the dividends which the trustees would have received if they had paid the notes. We ask the court to substitute us to the rights which would have been vested in these trustees if they or Jones had paid his notes.

The notes of Hancock & Mann held by them, come within the terms of the mortgages, and to secure which they were executed, and the only defect in their title to participate in the fund arises from the fact that the notes of Jones given in exchange have not been paid. But the petitioners produce his notes and thus supply the absent link in the chain of title. If the dividends are not paid to the holders of this paper of Jones, the money must go back to Hancock & Mann, although when they negotiated the paper of Jones, it must be presumed, they received value for it. This would clearly be inequitable, and the only way to avoid it is by resorting to the doctrine of substitution and ordering the dividends to be paid directly to the holders of the paper given by Jones. The objection to this application of the fund arises from the fact, that the notes of Jones do not come within the literal terms of the mortgages, which speak of "notes or bills of exchange made, accepted or endorsed by Hancock & Mann, and by them passed to Dawson & Norwood." But the substantial object of the arrangement was to secure Dawson & Norwood, for responsibilities to be incurred by them upon commercial paper made for the accommodation of the mortgagors, and, I, therefore, think, that it extends to and covers all such paper, for the payment of which Dawson & Norwood became liable, and as the paper of Hancock & Mann, held by the trustees of Jones is of that description, I can see no reason why it should not in equity be regarded as the property of those parties who hold the paper given by Jones in exchange for it. Suppose Jones, instead of giving his own notes in exchange for

this paper of Hancock & Mann, endorsed by Dawson & Norwood, had put his name to it as endorser, and passed it for value, could there be a doubt of the right of the assignees to share in the fund ? But if instead of doing so, he passed his own notes to Dawson & Norwood in exchange, which notes were endorsed by them, he, Jones, retaining the notes of Hancock & Mann, why should not the parties who receive these notes of Jones be, by substitution, considered as the holders of the notes of Hancock & Mann, and as such entitled to the benefit of the security ?

My opinion, therefore, is, that the petitioners, Hopkins & Brothers, and the other parties who hold the paper of Samuel Jones, endorsed by Dawson & Norwood, which paper was given in exchange for the paper of Hancock & Mann, now in the possession of the trustees of Jones, are to be treated as if they held this latter paper, and entitled to dividends of the fund. And when, upon the paper of Jones, the names of Dawson & Norwood do not appear, the same right of substitution exists, when upon that of Hancock & Mann, for which such paper of Jones was given in exchange, Dawson & Norwood are endorsers, the object of the mortgages being to secure Dawson & Norwood.

The Auditor, in his report of the 10th of July, 1849, says that it appears that no part of the paper given by Jones in exchange for the paper of Hancock & Mann, endorsed by Dawson & Norwood, has been paid by Jones, and submits whether any portion of the fund should be assigned to his trustees, Winn & Ross, and whether, as soon as it shall clearly appear how many of the claims filed are really entitled to substitution as exchange paper, they ought not to receive their proportion of the fund, to the exclusion of said trustees.

That these trustees can receive no part of these funds until they shall have paid in whole or in part the notes given by Jones in exchange for those of Hancock & Mann, in their possession, has been already decided. This is not the case of cross paper, given for mutual accommodation, when each party is liable to pay his own. The paper of Hancock & Mann was not to be, nor was it in fact, negotiated by Jones. He held it

as security for the loan of his own paper, given in exchange for it. The case is not within the principle of the cases referred to, which prove that the holder of cross paper may prove under a commission, by taking up his own note, or exonerating the estate of the bankrupt. 3 *Denio*, 187; 1 *Eden on Bankrupts*, 150, 160, 163; *Byles on Bills*, 343, 344; 4 *Taunt*, 200; 7 *Term Rep.*, 565; 2 *Term Rep.*, 100. It is not enough to entitle Winn & Ross to a dividend that they show the estate of Hancock & Mann will not be exposed to a double charge. They must show that the estate of Jones has been damnified by his paying his own notes issued for the paper of Hancock & Mann. If none of these notes have been paid by Jones, as stated by the Auditor, then they must be outstanding, and the holders of them, and not Jones or his trustees, are the parties who, by substitution, are entitled to participate in the fund.

My opinion, therefore, is, that the trustees of Jones are not entitled to dividends, simply because they hold the paper of Hancock & Mann, and that unless they can show that the paper of Jones, exchanged for it, has been paid, they must be excluded.

I am of opinion that the exception taken by the complainants to the account stated by the Auditor between the mortgaged estate and Clark & Kellogg, cannot be supported, and the exception will be overruled.

The petition of Clark & Kellogg, for the advance to them of a fee to counsel, to be paid out of the money in their hands, cannot be allowed except upon the ground of consent. No precedent for such an allowance can be found, and it is readily perceived that the principle upon which it is claimed would make this court, in a great number of cases, the medium by which the fees of counsel would be adjusted. Allowances of counsel fees are made under the head of just allowances to trustees, but it is believed that neither in this country nor in England was a stakeholder, even viewing Clark & Kellogg as occupying simply that character, ever allowed counsel fees out of funds in his hands.

I am also of opinion that the claim of Wells & Miller, under the mechanics lien law, cannot be supported, the evidence brought in since the order of the 15th of December, 1847, not removing the objections which appeared then, and seem to me now fatal to said claim. The exceptions, therefore, of these parties, to the report of the Auditor, will be overruled.

With regard to the question of the amount of materials on hand when the mortgaged premises were taken possession of by Dawson & Norwood on the 19th of June, 1846, I am of opinion that it must be assumed from the evidence that they were worth $18,000, and that the account of the Auditor, founded upon that assumption, is correct. The deficit upon that assumption, as shown by the Auditor's report of the 3d of December, 1849, is but $499 12, and looking to the previous operations of the factory, it may, I think, reasonably be sup-- posed that that small sum was lost by the same causes which had swept away so much capital.

The account of the Auditor, founded upon this estimate, cannot now be affirmed, because it assigns portions of the proceeds to Winn & Ross, trustees of Jones, they being, in my opinion, entitled to nothing, inasmuch as no part of the notes of Hancock & Mann, held by them, have been paid.

The case, therefore, will be referred to the Auditor, to state a final account, distributing the entire fund among the parties entitled, according to their rights as hereinbefore decided, it being now fair to infer that all the holders of the paper of Jones, given in exchange for that of Hancock & Mann, have come in.

———

[An order was passed on the 10th of January, 1850, referring the cause to the Auditor, in accordance with the foregoing opinion. The Auditor afterwards made a report, and stated several accounts to which exceptions were again filed by the parties. Upon the hearing of these exceptions, the following opinion of the Chancellor was delivered on the 21st of May, 1850.]

THE CHANCELLOR:

Since the order of the 10th of January last, the Auditor has made a further report, and stated sundry accounts to which exceptions have been filed by the parties, and the questions having been argued orally and in writing by the solicitors of the parties, are now, by agreement, submitted for decision.

The cause has been depending since October, 1846, and it is to be regretted that so much time has been consumed before the parties really entitled can receive the benefit of the fund intended for them. I am persuaded, however, when the circumstances connected with this case are considered, and the number and variety of the questions which have been raised and discussed are brought into view, that however much we may regret the delay, it will be quite apparent that the causes which have produced it are abundantly sufficient for the purpose.

Since the order of the 10th of January, a number of additional claims have been filed, and a portion of these having been allowed by the Auditor, the last argument has been directed chiefly to the question whether, as against the plaintiffs, who have plead the statute of limitations, these claims are barred?

According to the established rule of this court, adopted and approved of by the Court of Appeals, "the statute of limitations runs against a claim or debt down to the time it is exhibited." And as the claims in question are founded upon promissory notes, and more than three years have elapsed between their maturity and exhibition in this court, the bar, so far as the plaintiffs are concerned, would be complete, and they would, with respect to the plaintiffs, be excluded if there was nothing in the case to save them from the operation of the statute. *Hall* vs. *Creswell*, 12 *G. & J.*, 48.

These creditors are here seeking payment of their claims out of the proceeds of mortgaged property pledged for their security, they being, according to the former opinion, subrogated in the place of those whose claims come within the terms of the mortgage, and it therefore appears to me that unless the de-

fence of limitations would have been available as against the parties to whose rights they are substituted, it cannot avail as against them. The mortgage in this case, as has been said, was executed for the security of Dawson & Norwood, and when parties are found in possession of claims against which, by the terms of the instrument, they, Dawson & Norwood, were entitled' to be indemnified, those parties are, with respect to the security, clothed with their rights, and are only to be defeated upon grounds which would have been good as against them. It is admitted, that if a promissory note is secured by a mortgage, the mortgagee having the legal title, is not ousted by his note's being barred, because (as it is said in the argument) the debt only is barred, and the party holding the title may retain his legal advantage.

But here we are dealing with a case in which, upon a principle of equity, the doctrine of substitution is resorted to, by which the party having in equity a title to the benefit of the security is put in the place of him in whom the legal title has vested. This consequence appears to me to be involved in the principle of substitution, and that it would be wholly incomplete and fall far short of working out the end for which it was designed if it was not fully carried out to this extent. If, then, these creditors are substituted in equity in the place of the mortgagees, (as I think they are entitled to be,) it follows that with respect to the proceeds of the mortgaged property, the plea of limitations relied upon by these plaintiffs is not a bar. The opinion of the Chancellor in the case of *Heyer* vs. *Pruyn*, 7 *Paige*, 465, impairs very much the weight of Mr. Justice Sutherland in 7 *Wend.*, 94, and takes, as I think, the true distinction between a suit on the note secured by a mortgage, and a proceeding upon the mortgage itself to affect the mortgaged property, a distinction very clearly drawn by the Court of Appeals of this state in the case of *Watkins* vs. *Harwood*, 2 *G. & J.*, 307. The case of *Hughson* vs. *Mandeville & Snowden*, 4 *Desaussure*, 87, I have examined, but do not think it asserts a doctrine at all inconsistent with the conclusion which I have formed in this case.

It is also objected that the allowance of the claims filed since the order of the 10th of January last, that they come in too late, because it is said that order directed the Auditor to state a final account, it being as expressed in the opinion fair to infer that all the holders of Jones' paper given in exchange for that of Hancock and Mann, had already come in.

In cases like the present, the practice of the court is to allow creditors to come in at any time before a distribution of the proceeds of the sale has been actually made. So long as the fund is under the control of the court, it will let a creditor in who has been guilty of no negligence, and if necessary send the case to the Auditor to have a new account stated at his expense, as it must frequently happen that notwithstanding the usual method is resorted to to notify creditors, they are not in fact apprized of the proceedings. *Strike's Case,* 1 *Bland,* 86 ; *Hammond* vs. *Hammond,* 2 *Bland,* 364. If, to be sure, a creditor has been notified of the proceedings, and after a reasonable time allowed him to support his claim by proofs, he has failed to do so, and an account rejecting his claim because of such failure has been ratified by the court, it will not be re-opened at his instance to permit him to introduce fresh evidence, though the fund still remains in the hands of the trustee. *Kent* vs. *O'Hara,* 7 *G. & J.,* 212. But, as observed by the Chief Justice in that case, if the claim of the creditor had not been submitted to the Chancellor, and passed upon before the fund remaining in the hands of the trustee had been parted with, it would have presented a different case.

In this case these additional claims which have been filed since the last order have not been before submitted to the Chancellor, and passed upon by him, and, therefore, I think if they are sufficiently sustained by evidence, the holders of them are entitled to participate with the rest of the creditors in the fund to be distributed.

The mortgages in this case, as has been several times said, were executed for the security of Dawson and Norwood, and therefore, as has already been decided, the holders of the paper of Jones, endorsed by these parties, given in exchange for the

paper of Hancock and Mann, held by the trustees of Jones, are entitled to dividends of the fund. And when upon the paper of Jones the names of Dawson and Norwood do not appear the same right exists and founded upon the same principle of substitution, when their names do appear upon the paper of Hancock and Mann for which the paper of Jones was given in exchange.

The Auditor states in his last report that he has admitted into the account, filed therewith, all of the claims filed where the exchange and counter notes appear to have been dated after the 11th of April, 1846, and where the names of Hancock and Mann appear on either the exchange or counter notes.

This course on the part of the Auditor is supposed to be in conflict with the former judgment of the court which, according to the argument filed by the solicitor of one of the parties, determines that the right to participate in the fund depends not upon the date of the notes of Hancock and Mann, but of those of Jones given in exchange. Such, however, is not the view taken in either of the former opinions in this case. Upon this point it was said in the opinion of the 10th of January last, "that the notes of Hancock and Mann, held by Winn and Ross, trustees of Samuel Jones, Jr., which bear date prior to the mortgage of the 11th of April, 1846, are not entitled to the benefit of that security, and must be excluded from participating in the fund," &c. And as the holders of the paper of Jones given in exchange for that of Hancock and Mann are let in upon the principle of substitution, it would necessarily follow that the parties holding it are placed precisely in the condition they would have occupied if they held the obligations of Hancock and Mann, and that if the latter would have been excluded because dated prior to the mortgage, so must the former. This seems to result from the principle of substitution which places the substitute in all respects in the place of the party substituted. I am of opinion, therefore, that the Auditor was right in excluding the notes in question from dividends of the fund.

By the order of the 10th of January last, the cause was re-

ferred to the Auditor with directions to state a *final account* distributing the entire fund among the parties entitled according to their rights as therein decided.

As has already been said, it is not in conformity with the practice of this court, nor as I conceive consistent with the justice of the case, when the fund has not been parted with to exclude the claims of creditors who had not come in at the period of the passage of such an order. So long as the money is under the court's control, no creditor will be shut out who has not had an opportunity of establishing his claim, and therefore it is that I am of opinion that the creditors who have come in since the date of that order, are entitled to have their claims examined and passed upon unprejudiced thereby or by any previous order of the court. But I do not think it would be compatible with the due administration of justice and the rights of the other creditors to give further time for the production of evidence in support of claims not now sufficiently proved.

The order of the 10th of January in express terms directed the Auditor to state a *final account,* and it must be presumed that all the creditors, as well those whose claims had then been filed as those who have come in subsequently were aware of the nature of that order, and of the necessity of fortifying their claims by the requisite evidence. And not only were they by the terms of this order notified that the account was to be a final one, but the nature and kind of proof necessary to establish their claim was plainly indicated in the former opinions of this court.

The rejection of claim No. 30 is approved of, as is also the rejection of claims numbered 31, 32, 33, 34, 35, 36, 37, 38, 67, 69, 70, 71, 72, 68, 73, 74.

The Auditor states that claims numbered 42, 54, 55, 56, 57, 64, 65, and 66, were drawn in blank, and neither the names of Hancock and Mann nor of Dawson and Norwood appear upon them, and that Nos. 43, 46, 47, 49, and 59 are drawn in blank or in favor of Hancock and Mann, and by them endorsed, but the counter notes of Dawson and Norwood have not been filed and collaterals appear to have been given for them which he submits should be accounted for. My opinion is, that claims

22*

founded upon notes upon which the names of Hancock and Mann and Dawson and Norwood do not appear, either upon the notes given or taken in exchange should be excluded, and that all claims should be likewise excluded when the counter notes of Dawson and Norwood are not filed, and I also think that where collaterals have been given, they should be accounted for or the claims on account of which they were given should be excluded.

As some of the claims designated by the numbers mentioned in the last paragraph have been admitted by the Auditor, it will be necessary to send the case again to him, when the claims will be excluded unless the counter claims of Dawson and Norwood are filed and the collaterals accounted for.

It is, thereupon, ordered this 21st day of May, 1850, that this case be and the same is hereby referred to the Auditor to state a final account, distributing the fund among the parties entitled upon the principles, and according to the directions hereinbefore given. And as upon the petition of the solicitor I am of opinion that there should be a taxation of costs as between solicitor and client, and that all parties who participate in the fund should contribute to the payment of the fees so to be taxed. It is further ordered that said solicitor be allowed a fee of three hundred dollars out of said fund. All exceptions at variance with this order are overruled.

———

[A further opinion was delivered by the Chancellor on the 4th of November, 1850, upon the petition of George R. Vickers, filed in the cause since the passage of the last order. The facts upon which this petition is based and the questions raised by it are fully stated in said opinion, which is as follows.]

———

THE CHANCELLOR:

This case is brought before the court upon the petition of George R. Vickers, filed on the 28th of the last month, praying that a dividend allowed. him out of the fund due from and brought into court by Clarke and Mankin may be paid, notwithstanding the appeal taken by Mr. Glenn from the orders of the court under which the accounts of the Auditor were stated, and

though he has given an approved appeal bond for the due prosecution of that appeal.

The question presented by this petition is of great practical importance, and no precedent has been produced, and I am aware of no case in which the point now raised has been decided.

That the right of appeal should be preserved inviolate, no one will deny, and that nothing should be done by the court from whose judgment the appeal is taken to abridge, or in any way to impair, its enjoyment or to interfere with the substantial object of the privilege, is a proposition too clear to admit of doubt. Certainly this court feels no disposition to do so, and therefore, when it is asked to take a step in a cause, after an appeal taken and bond given for its due prosecution, it is indispensably necessary that it should be shown beyond all reasonable doubt that the step which it is called upon to take can, in no contingency which is at all likely to appear, prove injurious to the appellant. The reason for this is obvious. The party appealing can only arrest the execution of the judgment or decree of the court, of which he complains, by giving bond in an adequate penalty and with approved surety to indemnify the other party for any loss or injury he may sustain by reason of the delay. The latter, therefore, though he may not get the fruits of the judgment of the court in which he has been successful, so early as he otherwise would, is protected from loss by the appeal bond, if in the opinion of the superior court he has a title to such indemnity. But, if on the other hand the inferior tribunal proceeds notwithstanding the appeal, to execute its judgment, either in full or partially, upon the hypothesis that in any event which in its view of the case is likely to appear, the appellant will not be aggrieved by such complete or partial execution, and in the opinion of the superior court the entire judgment of the court below shall turn out to be erroneous, it is quite obvious that serious and irreparable injury may be done, because the party who has thus reaped the fruits of the recovered judgment has given no indemnity to the opposite party, and may himself be insolvent or inaccessible to his prosecution.

The argument in this case is, that as the claims of Mr. Glenn, who has given the bond, just exceeds $ 4,000, a full indemnity will be secured to him by retaining that amount, with such additional sum as may be required to cover interest and costs. But in the view which I take of this case, a state of things may very well happen, which would render this course altogether wrong, and in its results any thing but just to the appellant. The orders of this court, under which these funds have been distributed, exclude a particular class of creditors, as not within the protection of the mortgage, and also certain other claims, as insufficiently proved. These orders are appealed from, and in case the Court of Appeals should reverse my decree, they will, as was decided in the case of *Diffenderffer* vs. *Winder*, 3 *G., & J.*, 311, " exercise, as it were, an original equity jurisdiction, and place such a decree upon the record as the Chancellor ought to have passed."

Now, suppose the Court of Appeals should think that this court erred in excluding the holders of the notes of Hancock & Mann, which bear date prior to the mortgage of the 11th of April, 1846, or in excluding any other class of creditors for any cause, and should decide that all should come in and participate in the fund, is it not apparent that if Mr. Vickers, and the creditors who are now let in, should be permitted to receive their dividends, swelled as they are by the exclusion of those above referred to, that a manifest wrong would be done to the appellant? · In that event Mr. Vickers and the others would receive more, and the appellant less, than his due proportion of the fund. It is, as I conceive, no answer that the creditors of the excluded class have not appealed, because if the decree of this court should be reversed, the appellate court will decide the cause in the exercise of a *quasi* original jurisdiction, and may direct many creditors to come in and take shares of this fund who have been shut out.

If the, application of this petition is granted, it follows of course, that all others situated like him must be likewise paid, the court simply retaining so much of the fund as may be necessary, in its judgment, to indemnify the

appellant. The course now proposed would be establishing a new, and, as it seems to me, dangerous precedent, and one which may in this particular case result in consequences injurious to the appellant. The argument is, that if money enough is retained to cover the dividends allowed the appellant, with interest and costs, this cannot happen, and that the court should not extend the operation of the appeal, and the effect of the appeal bond further than may be necessary to secure this object. It has been already shown, however, that the Court of Appeals may, upon this appeal, if the decree of this court is reversed, entirely recast the accounts by letting in claims and classes of claims which have been excluded, and thus prejudice the appellant, if the petitioner is permitted to receive the dividend which has been allowed him by these accounts.

There is, moreover, another view, which demonstrates conclusively, as I think, the impropriety of paying the petitioner his dividend until the appeal shall have been decided. It will be seen, upon reference to the exceptions of the appellant, Glenn and others, to the Auditor's report, that the claims of the petitioner, Vickers, numbered 61, 62 and 63, are specially objected to, as not entitled to participate to any extent in the fund for the reason set forth in the exception. Now, suppose this exception, which has been overruled by the order of this court, should be sustained by the Court of Appeals, is it not manifest that the appellant may be aggrieved, if notwithstanding the appeal and bond, the dividend to Vickers should be paid? The ground of the exception is, that these claims of Mr. Vickers should not be permitted to come in upon the fund at all. But this court thought they were entitled to come in, and let them in, and thus diminished the dividend allowed to Mr. Glenn, the appellant, and the propriety of this decree of the Chancery Court is the question to be decided by the Court of Appeals. If the appellant succeeds upon his appeal, his dividend will be augmented, and yet it is said he can receive no prejudice if the court retains as much money as will pay the dividend awarded him by these accounts, although that dividend is undeniably less than it will be if his appeal to the Superior Court is successful.

Assuming that the Court of Appeals will reverse the decrees and orders of this court, (and the petitioner Vickers must make out his right to be paid his dividend in the present state of the case, upon that assumption,) and new accounts will necessarily have to be stated. How these new accounts will affect the rights of parties will, of course, depend upon the character of the judgment which may be pronounced by the Court of Appeals. The petitioner's dividend may be augmented, or it may be diminished, or he may be altogether excluded, and therefore to pay him now will be exposing the appellant to the risk of loss. The very object of his appeal and of the bond he has given, is to protect himself againt this risk, and he is entitled to this protection, the bond furnishing the other party an indemnity for such injury as he may sustain by the delay in case the appeal should be unsuccessful.

It may be that in a perfectly clear case, that is, when this court could see that the execution of its order could in no *possible contingency* prejudice the party appealing, that it would direct its execution. But it must be a case which would admit of no doubt, and perhaps in any case, however clear this court might see its way, such a course might be regarded as an undue stretch of authority, as the act of Assembly regulating writs of error and granting appeals, directs, by plain implication, that when a bond is given as prescribed by the act, the judgment or decree appealed from shall be stayed and delayed.

Now, in this case, the order of the 24th of July, 1850, under which the petitioner asks to be paid his dividend has been appealed from, and a bond given to prosecute the appeal according to the act of Assembly. The order, therefore, is stayed. Its power is suspended by virtue of the appeal and bond, and for this court to undertake to carry it into execution, notwithstanding the party appellant has done that which the legislature has said shall operate to stay its order, would seem to be an usurpation of authority. The case, indeed, must be strong and flagrant, which would justify such a course of proceeding. The present is not such a case, and, therefore, the application must be refused.

The next question has reference to the disposition which must be made of the money in court pending the appeal.   One side asks that it may be invested so as to be productive, whilst the other objects, and denies the authority of the court to make an investment without consent.   The amount is large, amounting to near twenty thousand dollars, and as some time may elapse before the appeal is decided, it would be a subject of regret if by the objection of any one of the litigating parties the whole body of creditors shall be made to suffer the serious loss which would result from keeping idle so large a sum of money for the period which is likely to intervene before the controversy is brought to a close.

If by the objection of several of the creditors, or those who appear to be creditors, the fund must remain unproductive, and the doctrine established that consent is necessary, then it would seem to follow that the consent of all must be obtained, and that if any one refuses his assent, all the rest must be made to suffer.   This I do not understand to be the rule of this court. The money is in its care, and I consider it bound in justice to those who may be ultimately entitled to receive it not to permit any one of the contesting parties to say it shall remain locked up and unprofitable until some future and indefinite period, or until he gives his assent to its investment.   In the present state of the case it is impossible to say who may be entitled to this fund.   The very object of the appeal is to settle that question, and it would therefore seem strange to allow any one of the claimants, whose title is controverted, to say, authoritatively, nothing shall be done with the money without my consent.

The court, therefore, will order an investment, but as the amount is large, and it would be satisfactory to receive the suggestions of those who appear to be entitled to it, as to the character and mode of the investment, a short time will be allowed to hear from them upon the subject.

[On the 30th of the same month, November, 1850, the Chancellor passed the following order in the cause.]

THE CHANCELLOR:

The consideration of the petition of George R. Vickers, filed on the 7th instant, was deferred to this day, and notice given to the petitioner's counsel, who desired to be heard. The questions now must be disposed of without further delay.

In the opinion delivered by this court on the 4th of the present month, its authority, and the propriety of investing the large amount now lying idle, pending the appeal, was asserted, and the power to make the investment is believed to be fully supported by the case of *Latimer* vs. *Hanson*, 1 *Bland*, 51, in which two successive Chancellors of this court maintained the power without requiring or waiting for the assent of all the parties interested.

The investment, therefore, must be made in the stock debt of the state of Maryland, or of the city of Baltimore, the application of the petitioner, Vickers, and of certain other parties to receive the dividends upon giving refunding bonds being deemed inadmissible.

Mr. Glenn in his answer to this last petition offers to make the investment without charge on his part, whilst it is fairly to be inferred from the terms of the recommendation of Mr. Alexander that he is to be compensated in case he should be appointed trustee for the purpose. Indeed, without his previous consent to forego commissions, he could not be denied some compensation for the service.

[An order was then passed appointing Mr. Glenn trustee to make the investment as above directed, upon giving bond with approved security.]